Carlos **KELLOGG**

v.

**UNITED STATES of America.**

**Civ. A. No. 89–7385.**

United States District Court,
E.D. Pennsylvania.

June 28, 1991.

Donald A. Marshall, Philadelphia, Pa., Joseph P. Flannery, Boston, Mass., for plaintiff.

Michael M. Baylson, U.S. Atty., Linda L. Shafer, Asst. U.S. Atty., James Yulman, Philadelphia, Pa., for defendant.

## DECISION AND ORDER

BECHTLE, Chief Judge.

### INTRODUCTION

Plaintiff, Carlos Kellogg, brought a seaman's personal injury action against the United States for injuries sustained when a line struck and seriously injured his left hand during a buoy retrieval operation while on board the U.S.N.S. Bartlett. After a non-jury trial, the court makes the following findings of fact and conclusions of law:

### FINDINGS OF FACT

1. The U.S.N.S. Bartlett ("Bartlett") is an oceanographic research vessel owned by the United States of America. The Bartlett is 208 feet long, and weighs 1,143 gross tons. The Bartlett is a public vessel and is used by various research organizations, both public and private, to perform government research.

2. During all relevant times, LSC Marine, Inc. ("LSC") operated the Bartlett pursuant to a contract with the Navy Department's Military Sealift Command ("MSC"). LSC, as the government's operating agent, was responsible to man, supply, and navigate the Bartlett for the Naval Oceanographic Office ("Navo") [sometimes referred to as "sponsor"].

3. Plaintiff, Carlos Kellogg, is a 48 year old Kansas resident. Kellogg received his master's license in 1980. He is an unlimited master sail with steam and motorboat endorsements. On September 7, 1987, he began work for LSC marine as chief mate on the Bartlett.

4. Navo engaged the Bartlett to conduct "surveys" or "missions" off the coast of Virginia. These missions involved deployment and retrieval of scientific instruments over the side of the vessel.

5. The research was conducted by Navo personnel. The ship carried a crew of 28, including officers, who operated the ship at the direction of MSC and Navo.

6. Before each mission, a pre-sail conference is held. The pre-sail conference is attended by representatives of the sponsor, the ship's master, and usually other ship's personnel, such as the chief mate, engineer, and chief steward.

7. During the pre-sail conference, the sponsor and the ship's crew discuss the upcoming mission, in order to coordinate the requirements of the mission, such as, for example, the itinerary and duration of the voyage, hours of operation, and a description of the objects that are going to be deployed.

8. The chief mate is the ship's safety officer. He has the overall responsibility for the safety of deployments and the safe use of all equipment. The chief mate must determine whether the equipment is adequate for stowage, and whether it is properly rigged for the intended operation.

9. The chief mate participates in the pre-sail conference to the extent that the

planning involves deck operations. Adjunct to the pre-sail conference, the chief mate is required to meet with sponsor personnel in order to plan and discuss each person's responsibilities during the mission.

10. The chief mate's authority extends to the sponsor personnel as well as to sponsor equipment. If the chief mate believes a certain piece of equipment is unsafe, it is incumbent upon him to take necessary action to make it safe. He has complete authority with respect to the direction of operations and may call any operation to a halt.

11. The Bartlett's boatswain, William Anderson, described the safety officer's job as follows:

A safety officer is an extra pair of eyes. He usually stands around in a higher point or an area of the deck where he can observe everything that is going on. His job is to overlook the whole operation and, if he sees anything that he does not feel is right or feels like there is something about to go wrong, he is to put a stop to the whole operation until it is corrected so nobody may get hurt.

(10/30/90 N.T. 181).

12. On November 18, 1987, a group from Navo joined the Bartlett at Moorehead City, North Carolina, for a 10–day mission to be conducted in an area about 75 miles off the coast of Virginia.

13. Captain Wasson, senior Navo representative James Turcotte, Navo rigger Mike Neill, and William Anderson attended an initial pre-sail conference. The basic goals of the mission were outlined during this conference. Kellogg, Neill, and Anderson attended a second pre-sail conference where specific aspects of the mission were discussed in detail.

14. At the second pre-sail meeting, Kellogg ordered Neill to direct and coordinate all sponsor deck operations. Although Kellogg did not limit Neill's authority, Kellogg remained ultimately responsible for deck operations.

15. On November 23, 1987, a navigation reference buoy was deployed. The buoy was designed and built by Neill. Its body was made of fiberglass and was roughly the size and shape of a 55–gallon drum. A reflector on top served as a navigation reference point. The buoy's underside was counterbalanced to keep it upright. It had a mooring line leading from the underside to a scrap chain anchor, designed to keep the buoy on station.

16. The buoy was fitted with a 50–foot "tag line" made of one-quarter inch polypropylene. The tag line provided a target for grappling the buoy at sea, and as means for drawing the buoy to the vessel. The end of the tag line had a small marker float that drew the line out to its full length, thereby presenting a better target.

17. To prepare for the buoy's recovery, a "retrieval line" was led off the stern, outboard of the starboard rail. It was fitted with a wide-throat snap hook for quick attachment to the float at the end of the tag line. The other end of the retrieval line led through a small snatch block and then over to the starboard capstan. A snatch block is a device that acts as an enclosed "pulley." It is built to withstand the weight and pressure of the line that is being passed through it. A capstan is a winch-like device which could supply motive power for hauling in the retrieval line.

18. The snatch block was attached to the base of the horizontal meter block—a permanent deck fixture roughly 30 feet forward of the stern and on the centerline. The snatch block was a "fairlead," getting the line over to the starboard capstan and around obstacles on deck. It also kept the retrieval line low to the deck so that it would be taken up properly on the capstan drum.

19. Because the tag line was longer than the distance between the snatch block and the stern, the buoy could not be drawn to the ship in a single reach using the retrieval line. Once the buoy was close to the ship, a "lift line" suspended from the stern U-frame was attached to a lifting fitting on the buoy, and the buoy was hoisted onto the deck of the ship.

20. A U-frame is a "U" shaped object that is attached to the deck of the ship. The U-frame can be raised and lowered

from an upright position to a horizontal position in order to raise and/or lower objects that are retrieved and deployed from the ship. Both the retrieval line and the lift line were made of 9/16-inch double braided nylon.

21. Had the tag line only been as long as the distance between the meter block and the stern, the buoy could have been pulled to the vessel in a single reach. A shorter tag line, however, would have created difficulties in other aspects of the operation.

22. Since the tag line had to serve as a grappling target, the longer it was the better the chances it could be grappled in one pass. With a minimum headway of three knots, a person attempting to throw a grapple from the ship would see a fifty-foot tag line go by in approximately ten seconds. Shortening the tag line to the distance between the meter block and the stern would shorten the grappling time to approximately five seconds.

23. Once the buoy fell off to the stern, the float end of the tag line had to be drawn over the starboard rail so that the retrieval line could be attached to it. The retrieval line had to be attached before the tag line was fully extended in order to avoid making the crew member holding the tag line a human link between the ship and the buoy. A 50-foot tag line provided the time needed to safely attach the retrieval line to the tag line.

24. There was also a danger that the propeller and rudder and scientific equipment mounted on the Bartlett's hull would get caught in the buoy's mooring line if the ship passed too close. A longer tag line enabled the ship to pass at a safe distance.

25. When the buoy was first deployed it submerged because its mooring line was too short. At the direction of Neill, the buoy was retrieved. Kellogg was on deck during the retrieval and was in charge of overall supervision.

26. The first retrieval proceeded as follows: The retrieval line was hauled in until the union between the retrieval line and the tag line approached the snatch block. The snap hook, the knot which attached it to the retrieval line, and the marker float were each too large to pass through the snatch block. At that point, the buoy was still some 20 feet off the stern and out of the reach of Neill, who was standing on the fantail with a reach pole, waiting to hook the lift line onto the buoy. The deck hands drew the buoy to the stern by hauling in the tag line by hand.

27. After the first retrieval and the buoy was back on board the Bartlett, Neill made changes to the retrieval apparatus. In addition to lengthening the mooring line, Neill changed the float fittings at the end of the tag line by adding a "D-ring" made of half-inch steel rod, approximately six inches long and three inches wide, between the end of the tag line and the float. One end was shackled to the tag line, the other end was shackled to the float to allow faster connection of the retrieval line snap hook to the tag line and a quick means of getting the float off the tag line. Neill did not change the length of the tag line.

28. The buoy was subsequently redeployed. On November 27, 1987, Navo decided that the buoy should be retrieved immediately. Winds were 25–30 knots, and seas were from five to eight feet. The weather conditions caused some concern but were not severe enough to warrant canceling the retrieval.

29. The buoy was grappled on the first pass. After the retrieval line had been attached to the tag line and the buoy fell off to the stern, the retrieval line was hauled in. Once the buoy reached the stern, the float was released from the tag line and the retrieval-tag line was drawn in some more.

30. Soon after, the tag line became stuck and could not be drawn in any further. Witnesses provided varying accounts as to what caused the tag line to stop moving.

31. Kellogg testified that the snap hook passed through the snatch block and the D-ring, which was added to the tag line after the first retrieval, fetched up on the block attached to the meter block.

32. Defendant contended that the D-ring could not have fetched up to the snatch block because no individual part of the entire assembly (which included a bowline knot, a snap hook, and the D-ring) at the end of the retrieval line could have passed though the snatch block. According to Neill, as the retrieval line was drawn in, the knot reached the snatch block before either the snap hook or the D-ring.

33. Believing that the stoppage of the retrieval line was a problem, Kellogg attempted to move the D-ring to the other side of the snatch block. Kellogg obtained a piece of half-inch cotton line, tied it to one of the legs of the meter block, passed it through the D-ring, and back around the meter block to serve as a stopper for the tag line.

34. Kellogg then detached the retrieval line from the D-ring, which placed tension on the cotton stopper line. Unaware of what Kellogg had done, the participating crew members continued on with the operation.

35. When the knot on the snap hook approached the snatch block, Neill ordered the capstan operator to stop hauling on the retrieval line. At that point the buoy was trailing about 20 feet aft of the vessel. The boatswain attempted to grapple the buoy with a reach pole, but the buoy was four to eight feet out of reach. The Bartlett was then slowed down to relieve some of the tension on the tag line.

36. Neill tied a snatch block to the lift line in order to draw the tag line up at its midsection toward the U-frame. This procedure put tension on the tag line.

37. Soon thereafter, the stopper line parted and the tag line came shooting aft through the snatch block which had been suspended from the U-frame. Either the tag line or the cotton stopper struck and seriously injured Kellogg's left hand. Another crew member was also injured.

38. The tag line did not break at the time of the accident. The tag line became severely abraded when it passed through the U-frame snatch block. Approximately ten minutes after the accident, the tag line parted and the buoy broke free. This occurred because Neill, not realizing that two crew members had been injured, grabbed the D-ring which was suspended by the tag line from the block on the U-frame and reattached the retrieval line, in an attempt to continue the mission.

39. Kellogg was removed from the ship by helicopter and taken to Norfolk General Hospital. He remained in the hospital for 24 days, during which time he had four operative procedures. The fourth finger on the left hand sustained multiple fractures and the fifth finger was eventually amputated.

CONCLUSIONS OF LAW

1. Plaintiff, Carlos Kellogg, filed a seaman's personal injury action against the United States. The action was brought pursuant to the Public Vessels Act, 46 U.S.C.App. § 781, *et seq.*, the Suits in Admiralty Act, 46 U.S.C.App. § 741, *et seq.*, and general maritime law. Jurisdiction is proper under 28 U.S.C. § 1331.

2. Kellogg alleges that Mike Neill, the rigger, was negligent in using a tag line that was too small for its purpose, in devising the method employed to retrieve the reference buoy, and in continuing the retrieval operation without advising Kellogg of his plans.

■ 3. The United States is liable for the negligence of the crew members of the Bartlett. *Novick v. United States*, 324 F.Supp. 1138, 1139 (E.D.Pa.1971).

■ 4. The proximate cause of Kellogg's injuries was the breaking of the stopper line that Kellogg unilaterally tied to the D-ring.

5. Kellogg failed to establish that the tag line used in connection with the reference buoy by the crew of the Bartlett was unfit for the purpose for which it was intended.

6. Kellogg failed to establish that the method devised and employed by Neill to retrieve the reference buoy was improper.

7. Kellogg failed to establish that his injuries proximately resulted from the negligence of any crew member of the Bartlett or that the Bartlett was unseaworthy.

CONCLUSION

As a result of the foregoing Findings of Fact and Conclusions of Law, judgment will be entered in favor of defendant and against plaintiff.